IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN  DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| V. | ) | CASE NO: 2:06-cr-173-MHT |
| | ) | |
| TANESHIA M. LAWSON | ) | |

## DEFENDANT'S RESPONSE TO MOTION TO STRIKE

**NOW COMES**  the defendant, Taneshia Lawson, by and through undersigned counsel, and makes the following response to the Motion to Strike filed by the Government (D.E. 87-1).

1.    Government counsel is correct that defense counsel did not provide notice of a defense of mental defect during the pretrial conferences in this matter at the initial appearance on July 25, 2006 or the pretrial conference on August 21, 2006.  The following describes the events of this case and why defense counsel requests this Court to permit the notice and presentation of the challenged evidence on behalf of Ms. Lawson,  and deny the Motion to Strike.

2.    The indictment in this case was filed on July 11, 2006 and charges Ms. Lawson and three codefendants with committing two offenses from October 1, 2003 through November 1, 2003.  The offense charged in Count 1 is conspiracy to violate 18 U.S.C. § 641 by committing theft of  money and things of value of the United States in an amount over $1,000, in violation of 18 U.S.C. § 371.  The offense charged in Count 2 is theft of  $2,193 of money and things of value belonging to the United States, in violation of 18 U.S.C. §§ 641

and 2. (D.E. 1).

3.     The Indictment alleges that all four defendants entered into a conspiracy to cash Social Security checks and that the three female defendants "did a number of overt acts" in order to effect the object of the conspiracy, including stealing the checks, traveling to the Quik Pawn Shop in Montgomery twice to cash the checks, cashing two checks on two different days, and dividing the proceeds.  (D.E. 1).

4.     Ms. Lawson was arrested, arraigned, and released on a non-surety bond on this indictment on July 25, 2006.  (D.E. 9 - 13).   The Order on Arraignment was entered on July 26, directed that all pretrial motions and notices, including notices under F.R.Cr.P. 12.2, be filed by August 16, 2006,  and set this case for a pretrial conference on August 21, 2006. (D.E. 12).

5.     Discovery was received from the government on or about August 2, 2006. Reports included in this discovery indicate these charges arose in October 2003, when four Social Security checks mailed to a neighbor of the defendant Monica Woodall were taken from the neighbor's mail.  Each check was in an amount around $552 and less than $1,000.

6.     Assuming accounts asserted in these reports are accurate, defense counsel would expect proof at trial to include testimony that two checks were cashed by the defendant Unique Muskelly on or about October 3, 2003; a third check was cashed on or about October 31, 2003 by Ms. Muskelly; and the fourth check was cashed on or about October 31, 2003 by Ms. Lawson.   All checks were accepted and cashed by Rufus Biggs,

the fourth defendant in this case, who was then working as a cashier at a Quik Pawn shop. Ms. Woodall drove the people cashing the checks to the Quik Pawn. There are inconsistent statements as to which defendant(s) committed the physical removal of each check from Ms. Woodall's neighbor's mail and which individuals, including defendants and non-defendants, received portions of the proceeds of each check.

7.    The reports included in the government's discovery further indicate that all four defendants, including Ms. Lawson, apparently signed written rights waivers and gave incriminating statements to law enforcement officers.

8.    Based upon an initial review of the discovery in this matter, and with Ms. Lawson's apparent approval, defense counsel initiated negotiations for a pretrial resolution of this matter with government counsel. Such discussions included brief conversations on August 21, September 6, September 19, September 25 and October 4.

9.    Defense counsel became concerned regarding the defendant's mental status when coworkers informed counsel that the defendant had indicated she had left a job at Sonic due to an inability to count change.

10.    Defense counsel orally notified Government counsel at some time during the week of October 2, 2006 (most likely on October 4, 5 or 6) that defense counsel had concerns about the defendant's mental status; had therefore arranged for a mental evaluation; and would provide Government counsel with the report of that evaluation immediately.

11.    Ms. Lawson was evaluated on October 6; report of the evaluation was faxed

3

to defense counsel's office on October 12 and sent to government counsel by October 13.

12.    On October 19, Ms. Lawson filed a Notice under F.R.Cr.P. 12.2(b).  (D.E. 77). While the notice was inartfully captioned "Notice of Diminished Mental Capacity Defense," the notice was intended to comply with the requirement of F.R.Cr.P. 12.2(b) that written notice be provided of an intent "to introduce expert evidence relating to a mental disease or defect or other mental condition of the defendant bearing on . . . the issue of guilt . . ." Notice of the expert and his testimony had already been provided to government counsel, through the faxing of the above-described report on October 12 or 13.[1]

13.    Rule 12.2(b) is <u>not</u> limited to affirmative defenses, and the notice was not intended to limit the proposed expert testimony to an affirmative defense.  As discussed below, this evidence will have relevance to several different issues which affect determination of guilt.

14.    The mental evaluation report is filed under seal with this Court (D.E. 87-2, 96) and consists of fifteen un-numbered pages.   Fax page numbers from 03 to 17 are shown in the upper right corner of each page and will be used to reference the report's contents.

15.    The report indicates that Ms. Lawson is now twenty-two years old, left school in tenth grade, and is five months pregnant with her third child.  (Report, pp. 3, 4).  Her full

---

[1]Defense counsel has also informed government counsel of the ongoing attempt to obtain additional records relating to Ms. Lawson's mental limitations, including the identity and fact of a second expert evaluation of Ms. Lawson on October 24; that report has not yet been received by defense counsel.

scale IQ score was measured at 66 on the Wechsler Adult Intelligence Scale (WAIS-III). (Report, p. 6). "Her over all level of cognitive functioning places [her] within the upper limits of the mild range of mental retardation." (Report, p. 7). Her spelling and reading level are at grades 4 and 3, respectively. (Report, p. 7). A test given to measure any possible malingering indicated that Ms. Lawson "was properly motivated to try to do her best during testing and was trying to put forth good effort during the interview and testing session . . ." (Report, pp. 8 - 9).

16.     Ms. Lawson was observed to have "an oddness concerning her behavior. She seems to be inattentive, daydreaming, and in another world, seemingly preoccupied more than normally expected." (Report, p. 5).She could not perform simple problems in arithmetic without pencil and paper. She did not identify the current president. She does not know the name of the state governor, or the number of weeks or days in a year, or current news. (Report, p. 5). She appeared anxious, depressed and scared. (Report, p. 6).

17.     The personality assessment of Ms. Lawson indicated that she "appears to be easily frighten[ed]; "may be frequently phobic;" "tends to have trouble making decisions and worries about what others will think of the decisions she has made." (Report, p. 7). "She is likely to give up quickly when things go wrong for her and to avoid conflict whenever possible." She is suspicious of offers to help her. She is "extremely introverted, shy, and bashful . . . . easily embarrassed and intimidated in social situations." (Report, p. 8).

18.     As the government has conceded, each of the charges pending against Ms.

5

Lawson is a crime of "specific intent," requiring the government to prove that Ms. Lawson

acted with the specific intent required to commit these inchoate offenses. (D.E. 87-1, fn 11).

To sustain a conviction on Count 1, the government must prove at least the degree of

criminal intent necessary to show intent to enter into an agreement to commit the substantive

offense, the felony of theft from the United States of over $1,000. 18 U.S.C. § 641. To

sustain a conviction on Count 2, on either direct action or on a theory of aiding and abetting,

the government must prove at least the degree of criminal intent necessary to show intent to

assist in the commission of the substantive offense of theft from the United States of $2,193.

19. "If a subjective state of mind is an element of a crime, evidence regarding the

existence or absence of that state of mind is evidence relevant to whether a crime was in fact

committed. Psychiatric evidence which negates *mens rea* thus negates an element of the

offense rather than constituting a justification or excuse," and is thus admissible. *United*

*States v. Westcott*, 83 F.3d 1354, 1358 (11th Cir. 1996), citing *United States v. Cameron*, 907

F.2d 1051, 1065 (11th Cir. 1990). Psychological evidence is relevant to *mens rea* when a

defendant is charged with a specific intent crime. *Cameron*, 907 F.2d at 1063, n. 20; *United*

*States v. Peralta*, 930 F.Supp. 1523, 1525 (S.D. Fla. 1996).

20. Evidence of mental retardation is relevant to determination of whether a

defendant charged with conspiracy has the charged "conspiratorial understanding and

purpose. . . . In particular, the evidence might help the jury to assess whether, or to what

degree, it could infer the requisite specific intent from [the defendant's] commission of the

6

charged acts." *United States v. Childress*, 58 F.3d 693, 728 - 730 (D.C. Cir. 1995) (holding evidence of the limitations of a defendant with an I.Q. of 71 to be "highly relevant" to assessment of his capacity to "entertain, specific intent to further the purposes of the conspiracy.") While Ms. Lawson's mental limitations may not "excuse" her personal activity in cashing one $552 check, they are relevant to the determination of whether she had the specific intent to further the purposes of either a conspiracy or a substantive felony theft to steal and cash four such checks. *Childress*, 58 F.3d at 730.

21.    Ms. Lawson's mental limitations will also be important in assessing what inferences of intent may be drawn from her participation in any overt acts, such as riding to the Quik Pawn Shop with Ms. Muskelly and Ms. Woodall. Courselle, Watt, Sheen, "Suspects, Defendants, and Offenders with Mental Retardation in Wyoming," 1 *Wyoming L.Rev.* 1, 55 (2001) (some "people with mental retardation have an impaired understanding of the wrongness of an act . . .")

22.    In addition, evidence of mental retardation will be relevant to the jury's determination of the accuracy and weight to be given to evidence of inculpatory statements alleged to have been made by Ms. Lawson. See Garcia, Steele, "Mentally Retarded Offenders in the Criminal Justice and Mental Retardation Services Systems in Florida," 41 *Ark. L. Rev.* 809, 824 (1988) ("These writers have had the experience, on several occasions, of having a mentally retarded adult 'confess' to a rule infraction or crime s/he did not commit, simply to escape the pressure involved in being questioned."); Appelbaum, Zaitchik,

"Mental Health Professionals Play Critical Role in Presentencing Evaluations," 19 *Mental and Physical Disability Law Reporter* 677 (1995) ("For offenders with mental retardation, some research suggests that they are viewed as more easily coerced into committing crimes and into confessing to criminal behavior."); Courselle, Watt, Sheen, "Suspects, Defendants, and Offenders with Mental Retardation in Wyoming," 1 *Wyoming L.Rev.* 1, 20 - 22 (2001) (describing mentally retarded persons' limitations in communication skills and abstract understanding of such concepts as blameworthiness and causation).

23.    In arranging for mental evaluation of Ms. Lawson almost four weeks before the scheduled trial date and filing the Rule 12.2 notice, defense counsel intended no inconvenience to the Court or government, nor any "eleventh-hour effort to create jury distraction." (D.E. 87-1, p. 8).   Rather, counsel is attempting to insure that Ms. Lawson's rights are fully protected and that the government and the Court are fully aware of the circumstances of the defendant.   See Courselle, Watt, Sheen, "Suspects, Defendants, and Offenders with Mental Retardation in Wyoming," 1 *Wyoming L.Rev.* 1, 34 (2001) ("defendants with mental retardation will be best served if the court is aware of and . . . make[s] appropriate accommodations to ensure that the defendant does not wind up being steamrolled by a system he or she does not understand.")

24.    Additionally, counsel acknowledges that, as observed by Judge Bazelon, "retardation frequently goes undetected." *United States v. Masthers*, 539 F.2d 721, 728 (D.C. Cir. 1976) (reversing district court order which denied evidentiary hearing to movant

seeking to vacate his guilty plea on the grounds of incompetence at the time the plea was entered). To the extent counsel has contributed to this problem by delayed recognition, counsel apologizes to the Court and opposing counsel. See Courselle, Watt, Sheen, "Suspects, Defendants, and Offenders with Mental Retardation in Wyoming," 1 *Wyoming L.Rev.* 1, 7, 8 (2001) (noting that there is a low rate of referral of defendants with mental retardation for pretrial evaluation, reflecting "a relatively common failure to recognize the 'existence and magnitude of the disability' and that underrecognition of the disability compromises the defendants' constitutional interests. . . . Even when an attorney is aware of the disability, appropriately accommodating the disability to protect the individual's rights presents additional challenges.")

25. This Court has both the authority to establish a schedule of deadlines for defendants to file motions and requests prior to trial and the authority to grant relief from non-compliance with such schedule. *United States v. Smith*, 918 F.2d 1501, 1509 (11th Cir. 1990). Rule 12.2(b), Federal Rules of Criminal Procedure, also permits this Court to, "for good cause, allow the defendant to file a late notice, grant the parties additional trial-preparation time, or make other appropriate orders." Under the unique circumstances of this case, undersigned defense counsel respectfully requests that such relief be granted to Ms. Lawson in this case and that the Motion to Strike be denied. As noted in the Government's alternative motion, defendant does not oppose the government's request for a continuance. (D.E. 88).

**WHEREFORE**, the Defendant respectfully prays that this Court permit Ms. Lawson to file notice pursuant to F.R.Cr.P. 12.2(b) and permit the introduction of evidence on Ms. Lawson's mental state at the relevant times and its impact on her intent to join the charged conspiracy or to commit and/or aid and abet the charged substantive offense. Defendant further requests that this Court deny the Motion to Strike.

Respectfully submitted,

**s/Christine A. Freeman**
**CHRISTINE A. FREEMAN**
**TN BAR NO.: 11892**
Attorney for Taneshia M. Lawson
Federal Defenders
Middle District of Alabama
201 Monroe Street, Suite 407
Montgomery, AL 36104
TEL:  (334) 834-2099
FAX:  (334) 834-0353
E-Mail: Christine_Freeman@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on October 26, 2006, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will send notification of such filing to

the following: Christopher Snyder, Assistant United States Attorney, One Court Square, Suite

201, Montgomery, Alabama 36104.

<div style="margin-left:40%">

**s/Christine A. Freeman**
**CHRISTINE A. FREEMAN**
**TN BAR NO.: 11892**
Attorney for Taneshia M. Lawson
Federal Defenders
Middle District of Alabama
201 Monroe Street, Suite 407
Montgomery, AL 36104
TEL:  (334) 834-2099
FAX:  (334) 834-0353
E-Mail: Christine_Freeman@fd.org

</div>