**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| V.                                                   ) | CASE NO: 2:06-cr-173-MHT |
| ) | |
| TANESHIA M. LAWSON         ) | |

<u>**DEFENDANT'S RESPONSE TO UNITED STATES' MOTION IN LIMINE
REGARDING SCHOOL RECORDS**</u>

**COMES NOW** the Defendant, Taneshia Lawson, by and through undersigned counsel, and pursuant to the Court's Order of November 3, 2006 (D.E. 132) and makes the following response in opposition to the Government's Motion in Limine (D.E. 129).

The Government seeks to exclude both (1) Ms. Lawson's school records and (2) "any lay testimony about [Ms.] Lawson's mental capacity, other than testimony about [Ms.] Lawson's mental state at the time of the offense."  (D.E. 130).  The Government argues that both are "irrelevant," and the school records are  "too remote in time" and should be excluded.  The Government misunderstands evidence of intellectual functioning and the issue in this case, and its motion should be denied.

**1.   School records are relevant to establishing mental retardation, which explains Ms. Lawson's limitations in intellectual functioning and inability to comprehend abstract concepts such as conspiracy and aiding and abetting.**

The Government's objection misrepresents or misunderstands the issue in this case. Ms. Lawson's school records and lay testimony about her mental capacity are not intended to show that Ms. Lawson "did not have the intent to steal or the intent to agree to steal on the

dates alleged in the Indictment," as argued by the Government (D.E. 129, p. 3). Rather, these items will help establish that Ms. Lawson was, and is, mentally retarded.

As a mentally retarded woman with an I.Q. of 66 or below, Ms. Lawson does not understand that she can be held criminally liable for checks which she did not steal, pass, or receive proceeds. Ms. Lawson is not capable of the abstract thought process required to intentionally criminally conspire to assist others in their stealing and cashing checks. Ms. Larson is also vulnerable to exploitation and use by others. This will be shown by establishing Ms. Lawson's subaverage intellectual functioning, limited adaptive functioning, and inability to understand abstract concepts.

This is a separate issue from Ms. Lawson's understanding of her personal liability for her own action in cashing one check, **which is not at issue in this trial**.

In *Atkins v. Virginia*, 536 U.S. 304, 318 (2002), the Supreme Court considered mental retardation in the context of criminal liability and eligibility for the death penalty. The Court found:

> Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial. Because of their impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others. There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders. Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability.

*Atkins v. Virginia*, 536 U.S. at 318.

The Supreme Court accepted a three-part test for establishing mental retardation. That test requires: (1) subaverage intellectual functioning, (2) "significant limitations in adaptive skills," and (3) both of the first two must have manifested before the age of 18. *Atkins*, 536 U.S. at 318. As the school records will assist in showing, Ms. Lawson meets all of these requirements. "Because of their impairments, [such persons] by definition ... have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." 536 U.S. at 318. They do not act on a "premeditated plan" and are "followers rather than leaders." 536 U.S. at 318.

While the Supreme Court declined to adopt a specific definition of mental retardation in *Atkins*, it cited extensively to the two most widely-accepted definitions: the definition developed by the American Association on Mental Retardation (AAMR) and that developed by the American Psychiatric Association (APA). *See Atkins*, 536 U.S. at 308, n.3. At the time *Atkins* was decided, both definitions required that a person demonstrate "significantly subaverage intellectual functioning" prior to turning eighteen, as well as significant deficits in two of ten areas of adaptive functioning (communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academics, work, leisure, and heath and safety).

Just after *Atkins* was decided, in late June of 2002, the AAMR published the tenth

edition of its manual *Mental Retardation: Definition, Classification, and Systems of Support* (AAMR Manual). This edition again defines mental retardation as "a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social and practical adaptive skills. This disability originates before age 18." AAMR Manual at 1. The *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition (2000) (DSM IV), published by the American Psychiatric Association (APA), states that "the cognitive IQ . . . tends to remain a more stable attribute." (DSM IV, p. 42). See also, *In re Holladay*, 331 F.3d 1169, 1174 - 1175 (n. 3, quoting standards adopted in *Atkins* at length) (11th Cir. 2003); *Holladay v. Campbell*, Case. No. CV-03-PT-1323-M, Document 103, (N.D. Ala., October 12, 2006) (Findings of Fact and Conclusions of Law) (concluding that "the Petitioner has been prior to age 18, and is now, mentally retarded.")

Thus, the AAMR, the APA, and the Supreme Court all require proof of intellectual functioning before the age of 18, to determine mental retardation. Ms. Lawson's school records are not "too remote in time," since they meet the required pre-18 criteria, and are necessary to establish that she meets the clinical definition of mental retardation.

### 2. The school records establish Ms. Lawson's mental retardation.

The school academic, achievement and test records of Ms. Lawson, which show consistent significant limitations in academic achievement and subaverage intellectual functioning prior to the age of 18 years, are therefore directly relevant evidence of Ms. Lawson's mental retardation. These records are not "marginally relevant," as argued by the

4

Government (D.E. 129, p. 4), but are indicators recognized by the Supreme Court as evidence establishing mental retardation. These records prove that Ms. Lawson was and is mentally retarded.

The records show that Ms. Lawson demonstrated significant deficits in adaptive behavior, prior to age 18. One of the important assumptions underlying the AAMR definition of mental retardation is the concept of comparing the functioning of the person to be diagnosed with that of his or her "age peers." AAMR Manual at 8. As the school records show, Ms. Lawson's adaptive behavior consistently lagged behind that of her age peers. Ms. Lawson's school records indicate that she consistently achieved below grade level scores on standardized tests, including the Otis Lennon School Ability Test and the Stanford Achievement Test.

For instance, when Ms. Lawson was in the fifth grade at Patterson Elementary School, at age ten years and eight months, her scores on the Stanford Achievement Test were no higher than the seventh percentile relative to her peers and she was in the lowest nationwide group in math and science and the next to lowest group in reading, language and social science. (Government exhibit, page 04). When Ms. Lawson was in the seventh grade, and age thirteen years and eight months, she achieved scores which placed her at the lowest percentile (1%) compared to same age children in the areas of total reading and vocabulary, with achievement comparable to children in the second grade. Her total School Ability Index ("SAI") was 71. (Government exhibit, pages 29, 30). When Ms. Lawson was fourteen years

and eight months old, and in the eighth grade, on an administration of the Otis Lennon, which measures a student's abstract thinking and reasoning ability, she achieved SAI scores of 60 and 68 respectively on the verbal and non-verbal sections of the test, and a total score of 58. (Government's exhibit, page 27). Like the standard I.Q. test, the SAI has an average score of 100 and is an indicator of a student's abilities relative to her age peers.

Ms. Lawson's school grades were consistent with these achievement tests. At Patterson Elementary, her grades in third, fourth, fifth and sixth grade were majority Ds and Fs. (Government exhibit, page 26). When she was in the seventh grade at Houston Hills Junior High, her final grades for the year included six Fs and two Ds. (Government exhibit, page 20).

Lags in academic achievement are indicative of adaptive functioning deficits. Specifically, Ms. Lawson's school records show deficits in functional academics (inability to read, write and construct sentences, poor performance in school and on standardized tests). All of Ms. Lawson's school records indicate that she consistently achieved **failing** or below average grades. This evidence is directly relevant to establishing Ms. Lawson's intellectual functioning throughout her life, including at the time of the indicted offenses.

### 3.    Lay testimony is admissible to establish intellectual functioning.

Lay witness testimony from Ms. Lawson's age peers and contemporaries is relevant and important because such testimony would establish that, consistent with the criteria for establishing mental retardation, Ms. Lawson's adaptive functioning deficits are marked and

6

debilitating compared to other individuals her age. Ms. Lawson demonstrates deficits in at least three areas of adaptive behavior skills: (1) Conceptual skills (inability to read, write and construct sentences; inability to understand money concepts); (2) Social skills (gullibility; being a follower; victimization) and (3) Practical skills (inability to manage money; inability to obtain a drivers license; inability to fill out employment applications; inability to protect herself).

The Government contends that "lay testimony regarding [Ms.] Lawson's alleged mental condition, which was not during or related to the relevant period of the Indictment, should be excluded." (D.E. 129, p. 7). Under Rule 701 of the Federal Rules of Evidence, lay witnesses are permitted to testify to opinions or inferences which are "(1) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Jurors are permitted to "make deductions and reach conclusions which reason and common sense lead [them] to make." *Eleventh Circuit Pattern Jury Instructions Criminal,* Basic Instructions, No. 4.2 (2003).

The law makes no distinction between direct or circumstantial evidence. *Id.* Evidence of Ms. Lawson's consistent intellectual limitations at various times in her life is both direct and circumstantial evidence of her intellectual limitations on the dates charged in the Indictment. *Vasquez-Ortiz v. Apfel*, 48 F.Supp.2d 250, 257 (W.D. N.Y. 1999) ("legal authority permits circumstantial evidence to establish the 'developmental' element of this

7

listed impairment. Mental retardation is defined as a life long condition. . . . Absent any evidence of a change in plaintiff's intellectual functioning, it is appropriate to assume that plaintiff's IQ has not changed since his twenty-second birthday."); *Maresh v. Barnhart*, 438 F.3d 897 (8th Cir. 2006) (same); *Moore v. Dretke*, 2005 WL 1606437, *15 (E.D.Tex.) (citing testimony by family members and acquaintances as evidence of defendant's adaptive deficiencies as a child and adolescent, relevant to appropriate penalty for the offense committed as an adult).

4. **Ms. Lawson will not submit irrelevant administrative records.**

The Government also objects that some of the records produced to the Government by Ms. Lawson are not Ms. Lawson's actual records, or are identical, or concern enrollment, attendance, class schedules, immunization, school lunch eligibility, or physical fitness. (D.E. 129, pp. 2, 3, 5). Defense counsel produced all school records to the Government as they were produced to defense counsel. Obviously, documents which do not relate to Ms. Lawson's intellectual or adaptive functioning will not be introduced by Ms. Lawson into evidence.

5. **Appropriate testimony is available to support the school records.**

The Government argues that school records custodians are not able to describe the tests contained in school records. (D.E. 129, p. 6) Whether the Government's fear is accurate or not depends on the particular individual records custodian, and defense counsel is confident that at least some of the records custodians will understand the records they

8

maintain and use in the course of their profession. The identity of these custodians is not known to defense counsel, which subpoenaed these witnesses as "records custodians." In addition, Dr. Theron Covin is a certified school psychometrist and will testify concerning the tests given to Ms. Lawson and the methods of assessing intellectual functioning. Dr. Covin received the school records after the Government received them.

School records and their custodians have been equally available to the Government and to the defendant. These records were obtained by subpoena, a method available to the Government. Dr. Covin's identity, address, and phone number have been known to the Government since at least October 13. To the best of defense counsel's knowledge, Government counsel has not contacted Dr. Covin, has not requested an evaluation of Ms. Lawson, and has not consulted with any alternative experts.

### Conclusion

The Government wants the jury to convict Ms. Lawson for these offenses, but does not want the jury to know the person they are potentially convicting. The evidence challenged by the Government is directly relevant to the central issue of this case: Ms. Lawson does not have the intellectual ability to form the specific intent required as an element of each of the charged offenses. The jury should be permitted to know of Ms. Lawson's intellectual limitations when it considers both direct and circumstantial evidence of specific intent. Without knowledge of this basic fact, the jury will not be able to accurately weigh and consider the evidence before it. The Government's motion should be

9

denied.

        Respectfully submitted,

        **s/Christine A. Freeman**
        **CHRISTINE A. FREEMAN**
        **TN BAR NO.: 11892**
        Attorney for Taneshia M. Lawson
        Federal Defenders
        Middle District of Alabama
        201 Monroe Street, Suite 407
        Montgomery, AL 36104
        TEL:  (334) 834-2099
        FAX:  (334) 834-0353
        E-Mail: Christine_Freeman@fd.org

**CERTIFICATE OF SERVICE**

I hereby certify that on November 5, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following: Christopher Snyder, Assistant United States Attorney, One Court Square, Suite 201, Montgomery, Alabama 36104.

        **s/Christine A. Freeman**
        **CHRISTINE A. FREEMAN**
        **TN BAR NO.: 11892**
        Attorney for Taneshia M. Lawson
        Federal Defenders
        Middle District of Alabama
        201 Monroe Street, Suite 407
        Montgomery, AL 36104
        TEL:  (334) 834-2099
        FAX:  (334) 834-0353
        E-Mail: Christine_Freeman@fd.org