IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| V. ) | CASE NO: 2:06-cr-173-MHT |
| ) | |
| TANESHIA M. LAWSON ) | |

**DEFENDANT TANESHIA M. LAWSON'S MOTION TO
EXCLUDE GOVERNMENT'S PROPOSED CROSS-RACIAL IDENTIFICATION,
AND CITATIONS OF AUTHORITY**

Comes now the Defendant, Taneshia M. Lawson ("Ms. Lawson"), by counsel and pursuant to Federal Rules of Evidence 104, 401, 402, 403, 404, and 701, and respectfully moves this Court to (1) prohibit the Government from introducing, in any opening or closing statement, argument, evidence, opinion, exhibit, photograph, video, or testimony, cross-racial identification of Ms. Lawson as the alleged perpetrator of the offense of passing a "bad check" at Sneakers in Auburn, Alabama, in October 2006; (2) to prohibit the Government from introducing any in-court witness identification of Ms. Lawson as the alleged perpetrator of the offense of passing a "bad check" at Sneakers in Auburn, Alabama, in October 2006; (3) to rule on this Motion prior to any opportunity for reference to such matters before a jury; and (4) if such matters are nonetheless held to be admissible over the Defendant's objection, provide appropriate limiting instructions at the time of the admission of such matters, and in closing instructions.

As grounds for this Motion, Defendant notes that admission of such evidence would violate Ms. Lawson's rights to due process and a fundamentally fair trial, in violation of the Fifth Amendment to the U.S. Constitution.

**Facts**

At a hearing on this motion, the Defendant would show the following:

1.  On Friday, November 3, 2006, at 1:41 p.m., the Government filed a document styled "United States' Proffer of and Notice of Intent to Use 404(b) Evidence." (D.E. 130).

2.  Sometime thereafter, defense counsel received two DVDs, and several documents, which included affidavits, police reports, some unrelated photographs, and a cover letter from Government counsel. These documents have previously been filed with this Court by defense counsel as attachments to "Defendant Taneshia M. Lawson's Notice of Opposition to Proposed 404(b) Evidence and Motion in Limine With Citations of Authority." (D.E. 134).

3.  Government counsel's letter to defense counsel stated in pertinent part that "The United States gives notice to defendant Taneshia Lawson and to the Court that it intends to introduce Rule 404(b) character evidence. The evidence is as follows: that on or about Saturday, October 21, 2006, Lawson cashed a fraudulent check at a Sneakers store in Auburn, Alabama, which did not belong to her and had been stolen from a woman with the initials J.H. Lawson also was present during the cashing of two other fraudulent checks at the same store on Sunday, October 22, 2006."

4.  The information proffered by the Government concerned the use of two different individual's stolen personal checks to buy shoes at a Sneakers store in Auburn, Alabama in October 2006.

5.  There appears to have been a presentation of three checks– one by a woman and two by a man who the employees believed to be accompanied by a woman.

6.  The information includes conflicting accounts of what happened, a description of criminal behavior by a man who is obviously not Ms. Lawson, a description of criminal behavior by

"unknown others" who are not Ms. Lawson, and conflicting cross-racial eyewitness identifications made by Sneakers employees of a woman **other than** Ms. Lawson.

    7.    As it specifically relates to the cross-racial eye-witness identifications, the evidence provided by the government includes:

    A.    A photo line-up of six young, African-American women marked with bates stamp number 106: This photo line up contains a circle around a picture of a woman who the government contends is Ms. Lawson, with the notation, "This is the female I saw on Sat 21. She also came in here one Sunday the 22 and stayed in here for about 2 hrs. Then got picked up. I saw **Simone** take her check on Sat the 21." (Emphasis added.) This photo identification indicates that it was made by Leah Epling ("Ms. Epling") on November 2, 2006, at a Sneakers store located in Auburn, Alabama. Defense investigators have determined that Ms. Epling is a Caucasian female employee at the Sneakers store. In addition, based on the dates referenced in this cross-racial identification, it is clear that this identification was made eleven (11) days after Ms. Epling saw the individual she attempted to identify.

    B.    A second photo line-up of six young, African-American women marked with bates stamp number 107: This photo line up contains a circle around a picture of a woman who the government contends is Ms. Lawson, with the notation, "I saw this lady in our store on Sunday October 22nd [sic] She entered the store **around the same time frame the transaction took place**. She was in the store for about an hour & a half on Sunday (using our store phone, etc.)" (Emphasis added.). This photo identification indicates that it was made by Nicki Thrailkill ("Ms. Thrailkill") on November 2, 2006, at a Sneakers store located in Auburn, Alabama. Defense investigators have determined that Ms. Thrailkill is a Caucasian female employee at the Sneakers store. In addition,

based on the dates referenced in this cross-racial identification, it is clear that this identification was made eleven (11) days after Ms. Thrailkill saw the individual she attempted to identify.

      C.    A third photo line-up of six young, African-American women marked with bates stamp number 110: This photo line up contains a circle around a picture of a woman who **does not appear to be Ms. Lawson and who the government apparently concedes is not Ms. Lawson.** This photo identification indicates that it was made by Simone Hicks ("Ms. Hicks") on November 2, 2006, at a Sneakers store located in Auburn, Alabama. Defense investigators have determined that Ms. Hicks is an African-American female employee at the Sneakers store. In addition, based on the dates referenced in this cross-racial identification, it is clear that this identification was made eleven (11) days after Ms. Hicks had direct contact with the individual she identified.

      D.    An Auburn Police Division Incident/Offense Report containing a suspect description of the woman who allegedly passed a forged check at the Sneakers store: This suspect description is provided by Adam Cook ("Mr. Cook"), identified in the report as the Sneakers store manager.(Bates stamp numbers 117, 119). Mr. Cook describes the woman as **a forty-five year old**, black female **weighing about 250 pounds and being almost six feet tall, specifically 5 foot and 9 inches.** This description which does describe Ms. Lawson, who is shorter, weighs less than 200 pounds, and is in her 20s.

      E.    Two statements by people (J.H. and E.C.) whose checks were apparently stolen and/or passed without their permission. (Bates stamp numbers 111, 114, 120 - 122). These statements do not describe checks being passed at Sneakers; state that the persons who took or passed the checks are unknown; refer to several other forgeries which are not identified by date or location; and do not include a single reference to anyone who could or might be Ms. Lawson. Notably, the driver's

license and police report provided by J.H. indicate that she is **42 years old, 240 pounds, and 5 feet and eight inches tall, almost identical to the description given by the Sneakers store manager**. Her photo was not included in the photo line-ups shown to the Sneakers employees.

8.  On information and belief, the person who made identification A would state that she believes she saw the person she was asked to identify on two consecutive days. However, she would also state that she had no direct contact with the person on either date; that her observations of that person did not note anything extraordinary, to cause her to "think about" the person at the time of either observation; and that she personally concluded the person overheard a conversation of the employees on the second day, which caused the person to leave the store.

9.  On information and belief, the person who made identification C would state that she believes the police officers who displayed the photo line-up to her were attempting to influence her identification and pressured her to make an identification. However, she would also state that while she observed the same man in the store on two consecutive days, she did not see any woman come to the store on both of the same two days. In particular, on the second day, she did not believe the man was in the store "with" or in the company of any woman, although he later spoke to another, female, customer. She would also state that the woman who gave her a check for shoes on one of the two days was not pictured within the photo line-up given to her.

10.  Substantial data and research supports the conclusion that individuals are less accurate when identifying people of another race, and more accurate when identifying a stranger who is of the same race as the identifier. This phenomenon has been labeled by researchers and social scientists as "own-race effect" or "own-race bias." Christian A. Messner, John C. Brigham, *Thirty Years of Investigating the Own-Race Bias in Memory for Faces A Meta-Analytical Review*, 7

PSYPPL 3 (2001); John P. Rutledge, *They All Look Alike: The Accuracy of Cross-Racial Identifications*, 28 Am. J. Crim. L. 207 (2001); Sheri Lynn Johnson, *Cross-Racial Identification Errors in Criminal Cases*, 69 CNLLR 934 (1984); *United States v. Telfaire*, 469 F.2d 552, 559 (C.A. D.C. 1972)("The available data, while not exhaustive unanimously supports the widely held commonsense view that members of one race have greater difficulty in accurately identifying members of a different race. The problem is by no means insubstantial.")(Bazelon, Chief Judge., concurring).

11.     There are several different bases for the "own-race bias." Some studies have shown that having a prejudicial attitude toward a certain racial group makes it more difficult to accurately identify people of that racial group. *See* Johnson, *supra* at 943-944. Some studies indicate that a lack of contact with or exposure to other ethnic groups makes accurate identification of people within those ethnic groups more difficult. *Id. See* Rutledge *supra* at 213-215. Other studies indicate that a person's ability to accurately identify faces is linked to the number and kinds of faces processed by the person beginning in childhood. *See* Johnson, *supra* at 944-945.

12.     Substantial data and research supports the conclusion that white Americans are more often mistaken when identifying a black American than are black Americans identifying white Americans or other black people:

> The 'own-race effect' is strongest when white witnesses attempt to recognize black subjects," and apparently less influential to black witnesses. In fact, four separate studies found that black eye witnesses do not experience any cross-racial impairment. And another found that blacks make better witnesses in general. But five other studies found that white eye witnesses simply experience the impairment more often than blacks. *See* Rutledge *supra* at 211.

"Ten studies document a significant difference in the ability of white American subjects to recognize

6

white and black faces. The impairment in ability to recognize black faces is substantial." *See* Johnson, *supra* at 938. Thus, the "the own-race effect is strongest and most consistent where white subjects attempt to identify faces." *Id*., at 949.

13.     On information and belief, an expert in eye witness identification would present testimony that cross-racial identifications are unreliable; that identifications by a white person of a black suspect are even more likely to be inaccurate; that the identification procedures used in the present case were suggestive; and that, based on the facts and circumstances of the present case, the identifications made by the white Sneakers employees of a black suspect are unreliable and are more likely to be inaccurate than accurate.

## Law

The admission of an out-of-court identification violates due process if there is a substantial likelihood of misidentification. *Neil v. Biggers*, 409 U.S. 188, 198 (1972). If an identification procedure was unduly suggestive, and if under the totality of the circumstances, the identification was not otherwise reliable, due process is violated by its admission. *United States v. Diaz*, 248 F.3d 1065, 1102 (11th Cir.2001). "(T)he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Neil v. Biggers,* 409 U.S. 188, 199 (1972).

Due process is also violated by a later in-court identification if the pretrial identification procedure was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification" at the later in-court identification. *Simmons v. United States*, 390 U.S.

377, 384 (1968).

Although the admission of such evidence is within the trial court's discretion, the Eleventh Circuit has held that lay opinion identification testimony is admissible under Federal Rule of Evidence 702 only if it "may be helpful to the jury where . . . 'there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury." *United States v. Pierce*, 136 F.3d 770, 774 (11th Cir. 1998). "(M)ost critical to this determination is the witness's level of familiarity with the defendant's appearance." *Id.* Rule 701 limits the admission of lay opinion testimony on any topic to circumstances where the witness's opinions are "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." FRE Rule 701.

The courts have recognized that "[c]ross-racial identifications are much less likely to be accurate than same race identifications." *Arizona v. Youngblood*, 488 U.S. 51, 72 n.8 (1988)(Blackmum, J.dissenting).

"Trial courts are free to exclude, sua sponte, inadmissible evidence. *Noel Shows, Inc. v. United States*, 721 F.2d 327, 330 (11th Cir.1983) (citing *C.B. Wright v. Hartford Accident & Indemnity Co.*, 580 F.2d 809, 810 (5th Cir.1978)); see also Charles Alan Wright & Kenneth W. Graham, Jr., 22 *Federal Practice and Procedure* § 5224 (1978 & Supp. 2002) (reasoning that trial courts may exclude evidence under Federal Rule of Evidence 403 without request). *Pickett v. Lindsay,* 56 Fed.Appx. 718, 723 (7th Cir. 2002).

## **Argument**

These standards support prohibition of presentation of the cross-racial identifications at issue.

1.  **Admission of the identifications would violate due process.**

    A.  **The cross-racial identifications were not reliable.**

The identifications made by the white employees do not meet the criteria of *Neil v. Biggers*, *supra,* for reliable identifications. The employees did not deal directly with the person they were later asked to identify. They never focused on that person. The employees' own descriptions to the store manager contradicted their later photo identifications. Moreover, almost two weeks had passed since the actual contact with the person they were being asked to identify. *Neil v. Biggers,* 409 U.S. 188, 199 (1972). These factors alone make the identifications inherently unreliable.

Moreover, the cross-racial factor has a substantial impact. As noted above, cross-racial identifications, especially by white witnesses, are likely to be inaccurate. The white employees had no prior familiarity with the African American woman they were being asked to identify.

    B.  **The photo line-up was unduly suggestive.**

In this case, the photo identification procedure was unduly suggestive because of what the photo spread did not include. A portion of the 404(b) evidence provided to defense counsel by the government is the description of the female who passed the stolen check. (Bates stamped 116-119). That description, according to its date, shows that it was provided to law enforcement on October 26, 2006. The description of the woman passing the stolen check provides that the woman was about forty-five years old, a black female weighing about 250 pounds and that she was 5 feet and 9 inches tall. As noted above, this description does not come close to describing Ms. Lawson.

Yet, on November 2, 2006, Sneaker's store employees were presented a photo spread in which Ms. Lawson's picture was prominently displayed in the top center of a few other photographs of young African-American women, none of whom appear to be in her mid to late forties in age. The

lack of photographs fitting the description of the suspect as provided by eye witnesses made the photo spread identification unduly suggestive and unreliable. *See Manson v. Brathwaite*, 432 U.S. 98, 117 (1977) (other individuals in photo spread should ideally resemble the suspect). *See also* John P. Rutledge, *They All Look Alike: The Accuracy of Cross-Racial Identifications*, 28 Am. J. Crim. L. 207, 209 (2001)("[S]taged 'identifications of individuals seen briefly in non-stressful conditions and after only short delays' have found that witnesses often failed to identify the target (i.e., the actual perpetrator) when the target was present in the photo array, and even more alarmingly, identified innocent persons when the target was not present.").

Moreover, it can not be overlooked that the Sneaker's manager's description does appear to be identical to the description of the African-American female who reported her checks stolen, Jaqueline Hubbard ("Ms. Hubbard"). A copy of Ms. Hubbard's allegedly stolen check, a signed statement from Ms. Hubbard verifying to law enforcement that the check was stolen, and a copy of Ms. Hubbard's driver's license were included as part of the government's proffer of 404(b) evidence. (Bates numbers 111-112). Ms. Hubbard's license indicates that she is 42 years old, 240 pounds, and 5 feet, 8 inches tall, almost identical to the description given by the Sneakers store manager. (Bates number 112). In addition, the signature on the allegedly stolen check appears strikingly similar to Ms. Hubbard's signature on her statement to law enforcement.

Yet, despite these obvious similarities, nothing in the 404(b) evidence provided to defense counsel indicates that law enforcement presented the Sneaker's employee's with any photo-spread containing Ms. Hubbard's picture. Nothing provided to defense counsel by the government indicates that law enforcement conducted any additional follow-up investigation regarding whether the black female the Sneakers employees actually saw was Ms. Hubbard.

In addition, on information and belief, the officers presenting the photo identification procedure pressured the witnesses to make an identification, even if none was possible.

### C. The photo identification procedure was not reliable.

Under the totality of the circumstances in this case, the identification was unreliable, because of the "own-race effect" present in this case; because suspects matching the actual description of the perpetrator were not included within the possible identifications; and also because the employees were not provided an opportunity to identify the person they saw until after the passage of eleven days. "Perception and memory are not purely deductive, but have substantial inductive components. . . . In addition, the construction of memory is greatly influenced by post-experience suggestions." John P. Rutledge, *They All Look Alike: The Accuracy of Cross-Racial Identifications*, 28 Am. J. Crim. L. 207, 208 (2001). After, the passage of such a significant period of time, eleven days, the Sneaker's employees' memories of the physical characteristics of who they saw in October surely had dulled. In addition, it is highly likely that the contact these employees may have had with other African-American women shopping inside the Sneakers store since their initial observations may have muddled their memory and perceptions of the characteristics of the woman they saw in October of 2006.

> Time is a very important factor in memory retrieval. As a rule, the longer the time period . . . the more difficulty we have retrieving the memory. In addition to the passage of time, it has been repeatedly demonstrated that retrieval of memories can be affected by a process known as unconscious transference. In this phenomenon, different memory images may become combined or confused with one another. This can manifest itself when an eyewitness, accurately recalling an innocent bystander at the scene of a crime, incorrectly identifies that bystander as the perpetrator. Henry F. Fradella, J.D., Ph.D., *Why Judges Should Admit Expert Testimony on the Unreliability of Eyewitness Testimony*, 2006 Fed. Cts L. Rev. 3, 14-15 (2006).

**2.    The identifications are not sufficiently reliable under FRE Rule 701.**

The essential requirement of Rule 701 is that lay opinion testimony be helpful to the jury and not simply invade the role of the jury.  "Thus, such testimony is improper when it involves only 'meaningless assertions which amount to little more than choosing up sides.' Fed.R.Evid. 701, Advisory Committee Note. Where, however, 'there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury,' the testimony is helpful and should be admitted."  United States v. Allen, 787 F.2d 933, 936 (4th Cir. 1986) (quoting *United States v. Farnsworth*, 729 F.2d 1158, 1160 (8th Cir.1984) and holding admission of lay identification testimony was proper where the witness knew the defendant over time and in a variety of circumstances, such that the witness's lay identification testimony offered to the jury "a perspective it could not acquire in its limited exposure" to the defendant.)

Lay "(i)dentification testimony is helpful to the jury 'when the witness possesses sufficiently relevant familiarity with the defendant that the jury cannot also possess, and when the photographs [of the defendant] are not either so unmistakably clear or so hopelessly obscure that the witness is no better suited than the jury to make the identification.'" *United States v. Kornegay*, 410 F.3d 89, 95 (1st Cir. 2005) (quoting *United States v. Jackman*, 48 F.3d 1 (1st Cir. 1995) and holding that witness' multiple encounters with defendant were sufficient basis for in-court identification.)

A "number of factors" are relevant to the determination of whether a lay witness is more likely than the jury to identify the defendant correctly, including (1) the witness's general level of familiarity with the defendant's appearance; (2) the witness's familiarity with the defendant's appearance at the time the surveillance photograph was taken or when the defendant was dressed in a manner similar to the individual depicted in the photograph; (3) whether the defendant had

disguised his appearance at the time of the offense; and (4) whether the defendant had altered his appearance prior to trial. *United States v. Pierce*, 136 F.3d 770, 774 - 775 (11th Cir.1998). See also, *United States v. Dixon*, 413 F.3d 540, 545 (6th Cir. 2005).

In *United States v. LaPierre*, 998 F.2d 1460, 1465 (9th Cir.1993), the Ninth Circuit held that the district court erred in admitting the lay opinion identification testimony of a police officer who identified the defendant in robbery surveillance photographs. The police officer had never met the defendant before the robbery and his knowledge was based on review of photographs of the defendant and the description of witnesses who knew the defendant. The Court held the police officer's level of familiarity with the defendant's appearance was insufficient under FRE Rule 701's requirement of helpfulness.

In the present case, the Sneakers employees had no prior interactions with Ms. Lawson, had no familiarity with Ms. Lawson, and had no direct contact with the woman they were attempting to identify during their original observation of her. These employees made these alleged identifications under suggestive circumstances eleven days after the observation which they were attempting to duplicate. There will be no contention that the perpetrator of the check-writing was disguised or that Ms. Lawson has changed her appearance since October 2006. There is no basis for any finding that these Sneakers employees are more likely to correctly identify the defendant from the photograph line-up than is the jury from the Sneakers surveillance video.

These facts weigh against the reliability and admissibility of the employees' photo identifications under Rule 701. *Pierce*, 136 F.3d at 774. See also *United States v. Middlebrook*, 141 Fed. Appx. 834 (11th Cir. 2005) (admission of lay testimony identifying defendant as bank robber was error, but harmless under the circumstances of the case).

**3.    The identifications are not sufficiently reliable under FRE Rule 404(b).**

As set out in Defendant's Motion in Limine (D.E. 134), these unreliable identifications also mean that the Government's proposed "404(b) evidence" does not meet the admissibility criteria of Rule 404(b). See *United States v. Veltmann*, 6 F.3d 1483, 1499 (11th Cir. 1993) (evidence of other crime was improperly admitted where there was no proof defendants were responsible for other crime) and *United States v. Utter*, 97 F.3d 509, 514 (11th Cir. 1996) (same).

**4.    The identifications are not admissible under FRE Rules 401, 402 and 403.**

Evidence which does not assist the trier of fact or which would confuse or prejudice the trier of fact, is irrelevant and inadmissible. *Federal Rules of Evidence 401, 402, 403.* Even if the Court determines separately that the Government may present evidence under Rule 404(b) of the passing of bad checks at Sneakers three years after the offense charged in this indictment, these unreliable identifications should also not be permitted because they are not a necessary part of that evidence.

As part of its 404(b) evidence, the government has provided defense counsel with composite video surveillance showing the individuals alleged to have been passing stolen checks at the Sneakers store on October 21 and 22, 2006. The government has already indicated that it intends to introduce this evidence at trial. As there is no evidence that Ms. Lawson has done anything to alter her appearance at any time and no individual shown on the video surveillance appears to be in disguise, a jury can make its own identifications from viewing the video surveillance at trial. *Pierce,* 136 F.3d at 775. Thus, any offer of lay witness identification testimony by the Sneaker's employees would be of no assistance to the jury, *Pierce,* 136 F.3d at 773, and its prejudicial effect would substantially outweigh its usefulness, in violation of Rule 403.

### 5. The identification testimony will be unduly prejudicial.

"[D]espite its inherent unreliability, much eyewitness identification evidence has a powerful impact on juries. Juries seem most receptive to and not inclined to discredit, testimony of a witness who states that he saw the defendant commit the crime."*Watkins v. Sowders*, 449 U.S. 341, 352 (1981).(Brennan, J., with whom Marshall, J., joined, dissenting). Thus, the unreliable cross-racial identifications that the government seeks to admit at trial in this case must be excluded to avoid any improper influence of a jury.

"(B)ecause there are no known and commonly understood correlates for the own-race effect, ordinary cross-examination will never elicit facts from which the jury can infer the impairment." Sheri Lynn Johnson, *Cross-Racial Identification Errors in Criminal Cases*, 69 CNLLR 934, 953 (1984).

> Thus, "if the witness honestly believes that he has a good memory for other-race faces, when in fact he does not, the best cross-examination will be to no avail. Because accuracy of other-race recognition appears to be wholly unrelated to confidence many witnesses who suffer from cross-racial recognition impairment will deny it and the jury will perceive only certainty and sincerity." *Id.*

Further, a jury can not weigh the problems of cross-racial eyewitness identification through common-sense analysis. "[L]aypersons dramatically 'overestimate the accuracy of memory in general.'" John P. Rutledge, *They All Look Alike: The Accuracy of Cross-Racial Identifications*, 28 Am. J. Crim. L. 207, 220 (2001).

> "Jurors tend to believe eyewitness accounts even in extremely doubtful circumstances. Moreover, at least one study found jurors generally unable to differentiate between accurate and inaccurate eyewitness testimony, even after cross-examination. This inability is partially attributable to the commonly held assumption that a witness's confidence is an important indicator of the accuracy of his testimony." *See* Johnson, *supra* at 946.

"In reality, 'the correlation between confidence and accuracy in eyewitness identifications is far lower than people probably would expect." John P. Rutledge, *They All Look Alike: The Accuracy of Cross-Racial Identifications*, 28 Am. J. Crim. L. 207, 223 (2001). Additionally, the phenomenon of "own-race effect" or "own-race bias" is one that surpasses common sense evaluations, by questioning it. *See United States v. Smith*, 736 F.2d 1103, 1107 (6th Cir. 1984).

Thus, the mere confidence in which the government's witness's present their cross-racial identification opinion testimony could improperly influence a jury despite the unreliability of the evidence being offered.

**6.      The evidence does not meet the criteria for admissibility under FRE 404(b).**

As separately argued in Ms. Lawson's prior Motion in Limine (D.E. 134), the Government's proposed evidence does not meet the requirements for admission of "other crimes" evidence under FRE 404(b).

**WHEREFORE**, the Defendant respectfully requests that this Motion be granted.

Respectfully submitted,

<u>s/Christine A. Freeman</u>
**CHRISTINE A. FREEMAN**
**TN BAR NO.: 11892**
Attorney for Taneshia M. Lawson
Federal Defenders
Middle District of Alabama
201 Monroe Street, Suite 407
Montgomery, AL 36104
TEL:   (334) 834-2099
FAX:   (334) 834-0353
E-Mail: Christine_Freeman@fd.org

**CERTIFICATE OF SERVICE**

      I hereby certify that on December 11, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following: Christopher Snyder, Assistant United States Attorney, One Court Square, Suite 201, Montgomery, Alabama 36104.

                                            **s/Christine A. Freeman**
                                            **CHRISTINE A. FREEMAN**
                                            **TN BAR NO.: 11892**
                                            Attorney for Taneshia M. Lawson
                                            Federal Defenders
                                            Middle District of Alabama
                                            201 Monroe Street, Suite 407
                                            Montgomery, AL 36104
                                            TEL:   (334) 834-2099
                                            FAX:   (334) 834-0353
                                            E-Mail: Christine_Freeman@fd.org